# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
November 4, 2014 Session

## STATE OF TENNESSEE v. LARRY FUTRELL and TERRELL SMITH

**Appeal from the Criminal Court for Shelby County**
**No. 10-06283     Chris Craft, Judge**

_____

**No. W2013-01192-CCA-R3-CD  - Filed January 23, 2015**

_____

Following a jury trial, the Defendants, Larry Futrell and Terrell Smith, were convicted of aggravated robbery.  On appeal, the Defendants contend that the evidence presented at trial was insufficient to support their convictions.  Mr. Smith also contends that the trial court erred in sentencing him to 26 years in the Department of Correction.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Paul K. Guibao (at sentencing and on appeal) and Rebecca Gardner Coffee (at trial), Memphis, Tennessee, for the appellant, Larry Futrell.

Robert Hardy, Jr. (on appeal) and Jake E. Erwin (at trial), Memphis, Tennessee, for the appellant, Terrell L. Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and Marianne Bell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I.  Factual and Procedural Background

In October 2010, the Shelby County Grand Jury indicted the Defendants, Larry Futrell ("Mr. Futrell") and Terrell Smith[1] ("Mr. Smith"), for aggravated robbery.  Following a trial in June 2012, a jury convicted both men as charged.  The trial court sentenced Mr. Futrell, as a Range II multiple offender, to a term of 17 years and Mr. Smith, as a Range III persistent offender, to 26 years in the Department of Correction.  Following a hearing, the trial court denied Mr. Futrell's motion for new trial on April 30, 2013, and Mr. Smith's motion for new trial on June 28, 2013.  The Defendants subsequently filed timely notices of appeal. Thereafter, this Court entered an order consolidating the Defendants' appeals.

Trial

Marcus Long testified that, in March 2009, he lived by himself in a three-bedroom house on Kitty Lee Lane in Memphis.  He worked part-time at a retail store and attended school for computer programming.  On March 28, 2009, Mr. Long's cousin, Martine Fields, asked him if she and her son could stay at his house.  Ms. Fields explained that she and her son had been in a car wreck and needed a place to stay until she received an insurance check from the accident.  Mr. Long agreed that Ms. Fields and her son could stay in one of his spare bedrooms.

When Ms. Fields arrived at his house on the morning of March 29, Mr. Long gave her a key to the residence and then left with his girlfriend to go shopping.  When he returned home later that evening, Ms. Fields told Mr. Long that someone had broken into the house. Mr. Long testified that he did not call police because he looked through the house and found nothing missing.  Mr. Long stated that there were no signs of forced entry and he believed that the intruder had entered through a back window that had been broken out in a previous burglary.

Mr. Long testified that, later that same evening, Mr. Smith called his cell phone and asked to speak to Ms. Fields.  Mr. Long did not know Mr. Smith, who identified himself only as "Terrell."  Mr. Long stood outside on the porch as Ms. Fields spoke to Mr. Smith inside the house.  About 10 minutes later, she brought the phone to Mr. Long and said that Mr. Smith wanted to talk to him.  Mr. Smith told Mr. Long that Ms. Fields was related to Mr. Smith's girlfriend. Mr. Smith said that "a whole lot of drugs" had "c[o]me up missing," and

_____

[1] At times in the record, Mr. Smith's name appears as "Terrell L. Smith."  For purposes of this appeal, we will use Mr. Smith's name as listed in the indictment.

2

he asked if Mr. Long thought Ms. Fields could have stolen the drugs and whether she had been "acting funny." Mr. Long told Mr. Smith that he did not know anything about the missing drugs and that he did not think Ms. Fields would have taken them. Mr. Smith said that he did not know who to believe or what had happened but "he could be in a lot of trouble about it . . . ." Mr. Smith then requested to speak to Ms. Fields again.

That same evening at approximately 9:00 p.m., Mr. Long was sitting on his porch when a black car pulled up, and a man, whom Ms. Fields later introduced as Mr. Smith, asked to speak to Ms. Fields. Mr. Long talked to Mr. Smith for about 15 minutes inside his carport.

Mr. Smith repeated what he had said to Mr. Long over the phone and told Mr. Long that Ms. Fields had moved the drugs from another house to Mr. Long's house. Mr. Smith said that "he knew it had been over to [Mr. Long's] house and it just came up missing so he knows somebody had to have something to do with it." However, Mr. Smith was not aggressive towards Mr. Long and did not blame Mr. Long. Mr. Smith again said that he was going to be in "a lot of trouble" and that it was "his head on the line." Mr. Long told Mr. Smith that he did not know anything and had been away from the house all day.

After Mr. Smith left, Mr. Long spoke to Ms. Fields and asked her what was going on. Mr. Long explained that he did not call police because:

> I had felt like at the time I was just going to tell [Ms. Fields] to leave and go and like I said, when I talked with [Mr. Smith], he wasn't violent toward me, he wasn't accusing me, you did this or you did that or anything. Like I said, the whole time we were talking the conversation was calm . . . .

Mr. Long did not tell Ms. Fields to leave that night because she had her son with her, and he was bruised and bandaged from the car accident. Ms. Fields told Mr. Long that she would get her check in a week or so, and he decided to let her stay until then.

Mr. Long left for school at 8:00 a.m. the following morning. Around 11:00 a.m., Mr. Long received a call from Ms. Fields, asking him "come to the house real quick" because they needed to talk. Mr. Long testified that, when he got home, Mr. Smith's black car was parked in his yard and Ms. Fields was in the living room with Mr. Smith. Mr. Smith began talking about the missing drugs again. He said, "[M]an, it was in this house, somebody had to do something with it, you know, it need [sic] to come up."

Mr. Long testified that, about ten minutes later, two "[t]all, dark, skinny guys with dreads" came into the residence through the front door. Mr. Long stated that the two men

3

looked like brothers but one man had longer hair and a skinnier face than the other man. Mr. Smith told Mr. Long "they're with [me]." The two men stood behind the couch as Mr. Long and Mr. Smith continued to talk. One man, whom Mr. Long identified as Mr. Futrell, asked if he could use the restroom. As Mr. Futrell walked towards the restroom, he turned around and pulled out a silver, automatic handgun and came towards Mr. Long, pointing the gun at his face. Mr. Futrell ordered Mr. Long to get down on the ground and said, "I know you know where the drugs [sic] at. All we want is the drugs." The other man with dreadlocks pushed Mr. Long onto the ground and sprayed him in the face with pepper spray. The men made Mr. Long take off his pants, shirt, and shoes and put his face in a pillow. He then felt someone put the gun to the back of his head.

Mr. Smith demanded to know the location of the missing drugs, but Mr. Long continued to deny knowing anything. Mr. Smith then told the other two assailants to take Mr. Long's gold AquaMaster watch, earrings, and keys. The men also took Mr. Long's cell phone, wallet, credit and debit cards, and $109 in cash. Mr. Long testified that because his face was in a pillow, he could not tell who was taking these items from him. Mr. Long testified that he did not give the Defendants permission to take his property.

Mr. Long testified that he was afraid for his life during the robbery. At one point, while the gun was still pointed at the back of his head, Mr. Futrell asked Mr. Smith if he should kill Mr. Long. Mr. Smith told Mr. Futrell not to kill him. Mr. Smith also told Mr. Futrell that they were going to take Ms. Fields with them. Mr. Long recalled that Mr. Smith was calm and appeared to be in control during the robbery.

After the assailants left with Ms. Fields, Mr. Long waited about ten minutes before getting up. Because of the pepper spray, Mr. Long could not see, and he had to take short breaths. He recalled that he fanned his face and eyes to help clear his eyes. He then put his clothes on and ran out the back door to a neighbor's house to call the police. The police arrived at Mr. Long's residence about 15 minutes later. Mr. Long was at the end of his driveway talking to police when Mr. Smith and Ms. Fields turned onto Kitty Lee Lane in Mr. Smith's black car. Mr. Long immediately identified the car and Mr. Smith to the police. The police stopped the vehicle and took Mr. Smith into custody.

Mr. Long testified that, the day after the robbery, he went to the police department to view a photo lineup. From the photographs, he identified Mr. Futrell as the gunman. Mr. Long explained that he was certain of his identification of Mr. Futrell because of his skinny face and dreadlocks and because "he was the guy that asked to use the restroom, so I had more of a look at him."

4

Memphis Police Officer Joseph Majors responded to a call at Mr. Long's residence on March 30, 2009. When he approached the front door of the house, Officer Majors smelled the strong odor of pepper spray coming from inside the residence. He noticed that Mr. Long's eyes were red and beginning to swell shut and he had mucous coming from his nose. Officer Majors testified that, based upon his experience, Mr. Long's appearance was consistent with having been pepper sprayed.

Mr. Long told Officer Majors that Ms. Fields had called him and told him to come home immediately. When he arrived, three black males were standing at the door with Ms. Fields, and there was a black car parked on the street. As Mr. Long walked into the house, one of the men said, "[W]e want our stuff back. We know you got it." One of the other men went to the restroom and came back out with a silver handgun. Mr. Long told the officer that one of the men sprayed him with pepper spray, and then they stole his gold AquaMaster watch, two credit cards, diamond earrings, and cash. He also told Officer Majors that the assailants took Ms. Fields with them when they left, and he provided a description of the suspects.

Officer Majors testified that, while he was talking to Mr. Long, Mr. Smith returned to the scene in a black car with Ms. Fields. Mr. Long told Officer Majors, "[T]hat's one of them right there." Officer Majors drew his weapon and ordered Mr. Smith to turn off his car and put his hands on the steering wheel. He then took Mr. Smith into custody. Officer Majors patted down Mr. Smith and found $1,909 in his possession. He then searched the car but did not find anything belonging to the victim. Mr. Smith was taken to the police station and advised of his Miranda rights. Although he waived his rights, Mr. Smith would not talk about the robbery.

Memphis Police Lieutenant Robert Wofford testified that, on March 30, 2009, he was on routine patrol in the area of the victim's residence when he saw two young men run to a green Oldsmobile Intrigue that was parked on Kitty Lee Lane. Both men were "somewhat tall, slender, male blacks, with dreadlocks." The men jumped into the car and took off. Finding their behavior suspicious, Lieutenant Wofford followed them. At a gas station about a block away, Lieutenant Wofford turned on his blue lights and stopped the car. Both men acted nervous when Lieutenant Wofford approached. As he was speaking with the driver, Lieutenant Wofford saw through the driver's side window a large-faced gold watch sitting on the front console between the driver and passenger seats. After Lieutenant Wofford ran the car's tag number, he determined that he had no reason to further detain the two men, so he let them go. A few minutes later, Lieutenant Wofford heard a police dispatcher's report of a home invasion robbery on Kitty Lee Lane. Lieutenant Wofford went to the scene and spoke to the victim and other responding officers, telling the officers about his stop of the two men in the green Oldsmobile. Lieutenant Wofford testified that he was later shown a

photo lineup that included Mr. Futrell's photo but he was unable to make a positive identification.

Memphis Police Sergeant Michael Brown testified that he also responded to the victim's residence on Kitty Lee Lane and was eventually assigned as the lead investigator on the case. The victim told Sergeant Brown that the assailants had taken his gold AquaMaster watch, diamond earrings, credit cards, and $109 in cash. Sergeant Brown went inside the victim's house and found it in disarray. Sergeant Brown testified that cushions had been removed from the couch and thrown in the floor in the living room. In the bedrooms, dresser drawers were pulled out and clothes were strewn across the rooms.

While at the scene, Sergeant Brown also spoke to Lieutenant Wofford, who said that he had seen two black males running towards a green Oldsmobile parked on Kitty Lee Lane. Lieutenant Wofford explained that he had followed them to a gas station and that, while speaking with the men, he had noticed a large gold watch inside the car. Lieutenant Wofford then gave Sergeant Brown the tag number to the green Oldsmobile.

Sergeant Brown testified that, on the day after the robbery, he and other officers went to 1176 McLemore Street, the address associated with the tag number of the green Oldsmobile. Upon approaching the residence, Sergeant Brown noticed that the green Oldsmobile was parked by the house. He heard loud music coming from inside the house, and when he knocked on the door and announced "police," the music stopped. Sergeant Brown had to knock on the door several times and wait several minutes before a woman and a young boy answered the door. Sergeant Brown told the woman, who was identified as Jackie Johnson, that they were investigating an aggravated robbery and that the green car sitting outside of the house was possibly involved in the robbery. Ms. Johnson began to look behind her nervously. When another officer asked her if she was okay, Ms. Johnson blurted out, "[H]e's in here. Who you're looking for is in here." Ms. Johnson exited the house and then consented to a search of her house.

At one point, the owner of the green Oldsmobile, Ms. Harris, arrived at the house on McLemore Street. Ms. Harris told Sergeant Brown that Mr. Futrell had used her car on the day of the robbery. Ms. Johnson then told Sergeant Brown that Mr. Futrell was her boyfriend and he was the person still inside the house.

Sergeant Brown testified that he and several other officers went inside the house but because of poor lighting and clutter inside the home, Sergeant Brown decided to call in the

TACT unit[2] and a negotiator to the scene. For several hours, the negotiator attempted to make contact with Mr. Futrell, but he never got a response. The TACT unit then searched the residence but could not locate Mr. Futrell.[3]

Lieutenant Christopher Kee testified that, on March 31, 2009, he showed the victim a photo lineup. Before showing the lineup, Lieutenant Kee advised the victim that he needed to be sure of his identification. The victim looked at the photographs and almost immediately pointed to the photograph of Mr. Futrell. He circled Mr. Futrell's picture and wrote on the photo spread, "This is the guy with the gun that robbed me."

Following the presentation of the proof, the jury convicted Mr. Futrell and Mr. Smith of aggravated robbery.

<u>Sentencing</u>

Helen Smith, Mr. Smith's mother, testified that she never had problems with her son when he was growing up. She explained that he graduated from high school and attended some college classes. She described him as a "good and loving person" and said that he was a good father to his children, one of whom is autistic.

Billie Cox testified that Mr. Smith had been married to her daughter and they had one daughter together before they divorced. Ms. Cox stated that Mr. Smith was a "great father" and had always provided for his children.

Mr. Smith testified in his own behalf. He has four children one of whom was very sick. He described himself as an active father and stated that he tried to be a good role model for his kids. He testified that he was a religious person, and he requested "some kind of leniency" so that he could be a part of his children's lives.

Mr. Smith admitted that he had a history of selling drugs and that he had five prior felony convictions and approximately nine prior misdemeanor convictions. He contended, however, that the felony offenses were committed when he was young and that the misdemeanors were mostly "driving charges." Mr. Smith denied participating in the robbery of Mr. Long and stated that, because he did not participate, he had no remorse for the crime. Mr. Smith asserted that the victim had lied at trial.

---

[2] Sergeant Brown explained that the TACT unit was a group of officers trained to use specialized equipment to go into places where a suspect may be hiding.

[3] Mr. Futrell turned himself in to police several weeks after the unsuccessful search of the house on McLemore Street.

In sentencing Mr. Smith, the trial court stated that it had reviewed the proof at trial, the presentence report, the nature of the criminal conduct involved, statistical information regarding the average sentence across the state for aggravated robbery, Mr. Smith's statement, and his potential for rehabilitation, which the court found "rather poor." The trial court found that Mr. Smith was a Range III, persistent offender, based upon his five prior felony convictions. The court noted that the sentence range for the Class B felony offense of aggravated robbery was between 20-30 years.

Looking at the presentence report, the trial court commented that Mr. Smith had no "real work history." He graduated from high school but then "[c]hose to be a drug dealer." Regarding enhancement factors, the trial court considered that the Defendant had a prior history of criminal convictions in addition to that necessary to establish his range. Specifically, the trial court noted that the Defendant had "a bunch of misdemeanor convictions," which showed a "repeated continuing effort to commit crimes, over thirty crimes in his life." The trial court gave this factor a "fair amount of weight." The trial court also found that Mr. Smith had previously been sentenced to Community Corrections but had violated the terms of the sentence. The trial court also considered as an enhancement factor that Mr. Smith was a leader in the commission of the offense in that he told Mr. Futrell and their accomplice what to do and Mr. Futrell had asked Mr. Smith whether to kill the victim.

Regarding the mitigating factors, the trial court considered that Mr. Smith had family support and children but ultimately stated:

> But the problem is that [Mr.] Smith, you know, he talks about his children and all that, but he's done nothing with his life except commit crimes. And get other people addicted to drugs so that they go on and commit murder, and rapes and burglaries and whatever they're going to do. He's had time after time after time to change and just will not change, just will not.

Based upon those considerations, the trial court sentenced Mr. Smith to 26 years in the Department of Correction.[4]

## II. Analysis

### Sufficiency of the Evidence

On appeal, Mr. Futrell and Mr. Smith contend that the evidence presented at trial was insufficient to support their convictions for aggravated robbery. We disagree.

---

[4] We have not summarized the trial court's sentencing determinations as to Mr. Futrell because he has not challenged his sentence on appeal.

The applicable standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and the Appellant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

In a jury trial, the weight and credibility given to the testimony of witnesses, as well as the reconciliation of conflicts in that testimony, are questions of fact best determined by the jury, since they saw and heard the witnesses, and by the trial judge, who concurred in and approved the verdict. Bland, 958 S.W.2d at 659. This Court will not reweigh the evidence. Id. On review, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant here, aggravated robbery is the "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. §§ 39-13-401(a), -402(a)(1) (2009).

In this case, when viewed in the light most favorable to the State, the evidence is sufficient for any rational trier of fact to find Mr. Futrell and Mr. Smith guilty of aggravated robbery, beyond a reasonable doubt. The victim testified that Mr. Smith, Mr. Futrell, and another unknown assailant entered his home, demanding to know the location of some missing drugs. Mr. Futrell pulled out a silver automatic handgun and pointed it at the victim's face and head. The unknown assailant pepper sprayed the victim and forced him to lie in the floor. When it became apparent that the missing drugs were not inside the home, Mr. Smith told Mr. Futrell to take the victim's gold watch, earrings, and keys. The men also took the victim's cell phone, wallet, credit and debit cards, and $109 in cash. At one point, Mr. Futrell put the gun to the back of the victim's head and asked Mr. Smith if he should kill the victim. The victim testified that he was afraid for his life during the robbery and that he did not give the Defendants permission to take his property.

9

On appeal, the Defendants argue that the evidence is insufficient because the victim lacked credibility and his testimony was inconsistent with that of other witnesses. Mr. Futrell also contends that the evidence is insufficient because Lieutenant Wofford never identified him as one of the people in the green Oldsmobile. However, the victim positively identified Mr. Futrell in a photo lineup and at trial, and a victim's identification of a defendant as the perpetrator of an offense is, alone, sufficient to establish identity. See State v. Hill, 987 S.W.2d 867, 870 (Tenn. Crim. App. 1998); State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). Moreover, the reconciliation of any inconsistencies in the victim's testimony is a credibility determination, which falls to the province of the jury. See State v. Pope, 427 S.W.3d 363, 369 (Tenn. 2013). In this case, the jury clearly resolved any conflict in testimony in favor of the State, as was its prerogative. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). We conclude, therefore, that the evidence was sufficient to sustain the Defendants' convictions.

## Sentencing of Mr. Smith

Mr. Smith also challenges the trial court's imposition of a 26-year sentence, arguing that the trial court wrongfully considered the enhancement factor that he was a leader in the offense. The State responds that the trial court acted within its discretion when sentencing the Defendant. We agree with the State.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. Id. at 554-55; State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978); State v. Delp, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing determination." Id. at 709. Moreover, under those circumstances, this Court may not disturb the sentence even if it had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401 (2013), Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2013).

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2013).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114 (2013); see also Bise, 380 S.W.3d at 699 n. 33, 704; Carter, 254 S.W.3d at 343. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Carter, 254 S.W.3d at 346.

11

In this case, the trial court imposed a sentence within the appropriate range, see Tenn. Code Ann. § 40-35-112(c)(2), and the sentence reflects a proper application of the purposes and principles of sentencing. Thus, we review the trial court's sentence for an abuse of discretion with a presumption of reasonableness. See Bise, 380 S.W.3d at 707.

In setting Mr. Smith's sentence at 26 years, the trial court applied three enhancement factors, including that the defendant was a leader in the commission of an offense involving two or more criminal actors. See Tenn. Code Ann. § 40-35-114(2) (2013). On appeal, Mr. Smith challenges the application of this enhancement factor. We conclude, however, that the evidence certainly supports the trial court's finding that Mr. Smith was a leader in the commission of the aggravated robbery.[5]

Based upon the foregoing, we find that Mr. Smith has failed to prove that the trial court in any way abused its discretion in sentencing and Mr. Smith is not entitled to relief.

### III. Conclusion

For the aforementioned reasons, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

---

[5] The trial court also found that the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range and that the Defendant, before trial or sentencing, had failed to comply with the conditions of a sentence involving release into the community. See Tenn. Code Ann. §§ 40-35-114(1), (8). Although Mr. Smith does not challenge the trial court's application of these enhancement factors, we note that the record also supports the trial court's findings under the factors.